**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

S.N., *a minor child, by and through her*
*parents, A.N. and C.N., and on their own*
*behalf*,

               Plaintiffs,

v.

Independent School District No. 630,

               Defendant.

Civ. No. 25-4265 (JWB/LIB)


**ORDER DENYING MOTION FOR**
**PRELIMINARY INJUNCTION**

---

Thomas B. Wieser, Esq., Meier, Kennedy & Quinn, Chartered, counsel for Plaintiffs.

Cameron Fox, Esq., and Timothy A. Sullivan, Esq., Ratwick, Roszak & Maloney, P.A.;
Mark S. Brown, Esq., Arthur, Chapman, Kettering, Smetak & Pikala, PA, counsel for
Defendant.

---

Plaintiffs S.N. and her parents seek a preliminary injunction compelling Defendant

Independent School District No. 630 (the "District" or "Red Lake Falls") to take

whatever steps are necessary to permit S.N., a senior, to play the 2025–2026 varsity girls'

basketball season for neighboring district, Red Lake County Central ("RLCC"). The

request arises after the beginning of the season, after the Minnesota State High School

League's ("MSHSL") deadlines for forming a cooperative sponsorship between member

districts has passed, and after the District's junior varsity team has already begun

practicing and competing.

In Minnesota, the only pathway relevant to this case for a student to play for another district once the season is underway is through a cooperative sponsorship under the MSHSL bylaws. Because high school athletic seasons are short and administrative calendars are fixed, requests of this kind carry real and sometimes permanent consequences. An injunction issued after a season commences may effectively determine a student's entire season before the merits can be adjudicated.

At this stage, Plaintiffs must demonstrate a likelihood of success under Title IX, irreparable harm, a balance of harms favoring intervention, and a public interest that supports judicial action after the start of the season. The present record does not meet that standard. Although RLCC was willing to roster S.N. as a Mustang in a cooperative sponsorship, the District faced sex-neutral structural and timing constraints it could not resolve unilaterally, and the evidence does not establish a similarly situated male student athlete comparator treated more favorably. On this preliminary showing, Plaintiffs have not carried their burden. The motion is denied.

## BACKGROUND

S.N. has played organized basketball for years and competed at the varsity level of girls' basketball for Red Lake Falls in eighth, ninth, and tenth grade. (Doc. No. 19 at 5.) Though the District could field a junior high and junior varsity girls' basketball team for the 2025–2026 season, the participation numbers did not support forming a varsity team. (Doc. No. 13 at 10–11; Doc. No. 14, Schmitz Decl. ¶ 25; Doc. No. 15, Greene Decl. ¶ 7.) Red Lake Falls, like many rural districts, relies on cooperative sponsorships to field teams it cannot support on its own. Its longstanding boys' basketball co-op with RLCC

2

has existed since the 2007–2008 season and includes both varsity and sub-varsity levels, jointly shared governance, shared practices, and shared home contests. (Doc. No. 22, Schmitz 2d. Decl. ¶ 2.)[1]

Red Lake Falls also participates in cooperative sponsorships for several girls' sports, including hockey, golf, cross-country, and track and field. (Schmitz Decl. ¶ 5.) These co-ops have operated across multiple seasons and involve shared governance and joint team administration with neighboring districts. (*Id.* ¶ 3.) These existing girls' co-ops demonstrate that the District has, in other contexts, partnered with neighboring districts when participation numbers were insufficient to support a stand-alone girls' program. This record, however, does not by itself resolve the distinct question of whether the District approached girls' basketball in a manner consistent with those practices. The present materials reflect no categorical refusal to form girls' co-ops, but the treatment of girls' basketball remains a separate issue addressed in the analysis that follows.

Under bylaws established by the MSHSL, the governing body responsible for regulating interscholastic athletics statewide, co-ops must encompass an entire program, not just varsity or sub-varsity level, and last at least two years. (Doc. No. 14-1 at 6; Schmitz 2d. Decl. ¶ 2.)

RLCC fields a full girls' basketball program. When the districts began discussing a cooperative sponsorship, RLCC's proposals differed depending on the structure of the

---

[1]    This Court does not rely on portions of the Schmitz 2d. Decl. that go beyond the factual clarifications requested at the November 20, 2025 hearing because Plaintiffs have not had an opportunity to respond, and those matters are unnecessary to this decision.

potential co-op. A "50/50 co-op" in Minnesota is a fully shared program: both districts exercise equal governance; share responsibility for coaching decisions, scheduling, and program administration; divide financial commitments equally; and compete under a jointly selected team name and identity. (Greene Decl. ¶ 3.) It is not a guest-player arrangement. RLCC was willing to enter such a 50/50 co-op with Red Lake Falls only if girls' volleyball and softball were included with basketball. (Doc. No. 13 at 10; Greene Decl. ¶¶ 4, 6.) RLCC stated it would not agree to a 50/50 co-op limited only to girls' basketball. (Greene Decl. ¶ 4.)

Separately, RLCC offered a "hosted" co-op limited to girls' basketball. (*See* Doc. No. 13 at 8, 18; Doc. No. 19, Ex. 4.) A hosted co-op is fundamentally different from a 50/50 arrangement. In a hosted co-op, the receiving district operates the program under its existing identity and governance structure, and the sending district's students participate as members of the host's team. RLCC's athletics teams compete under the RLCC banner as the Mustangs, and under a hosted arrangement any Red Lake Falls athletes—including S.N.—would join and compete as Mustangs rather than as Red Lake Falls Eagles. (Doc. No. 13 at 18; Doc. No. 16-1 at 16.)

The District declined both the multi-sport 50/50 and the hosted basketball-only proposals for reasons unrelated to the sex of the athletes. These reasons included: maintaining its girls' volleyball and softball programs, which Red Lake Falls can sufficiently field on its own (Schmitz Decl. ¶ 8); preserving the Eagles' identity at Red Lake Falls (Doc. No. 13 at 18); and continuing its plans to rebuild its own girls' basketball team (*id.*).

4

The parties concur that per MSHSL bylaws, no student—male or female—may compete for another member district absent a cooperative sponsorship (or another narrow MSHSL exception not applicable here). (Schmitz Decl. ¶ 15; Doc. No. 14-1 at 1–2.) Consistent with those rules, the District has never allowed a male athlete to participate for another district outside of a co-op, and Plaintiffs identified no instance where a male athlete did so.

On October 30, 2025, Plaintiffs' counsel sent a demand letter asking the District to confirm within eight days that S.N. would be permitted to play for RLCC in the 2025–2026 season. (Doc. No. 19, Ex. 3.) No girls' basketball co-op existed with RLCC. Under MSHSL bylaws, a proposed cooperative sponsorship must be submitted for MSHSL approval no later than 30 days before the first day of practice. (Schmitz Decl. ¶ 19.) Because the girls' basketball season started on November 10, 2025, the co-op application deadline fell around October 11, 2025. (*Id.* ¶ 20.) Plaintiffs' demand letter was untimely, arriving more than two weeks after the MSHSL co-op petition deadline had passed.

No MSHSL decision approving or disapproving of a Red Lake Falls-RLCC co-op for girls' basketball existed as the two school districts had never reached agreement and had never submitted a proposal. Plaintiffs did not explore co-ops through Red Lake Falls with any district other than RLCC. S.N. remains eligible to play junior varsity basketball for Red Lake Falls as a senior but has declined that opportunity. (Doc. No. 13 at 11.)

## ANALYSIS

### I.    Standard of Review

A preliminary injunction requires consideration of the *Dataphase* factors: likelihood of success on the merits, irreparable harm, the balance of harms, and the public interest. *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981) (en banc). The plaintiff bears the burden of establishing a likelihood—not the mere possibility—of success. *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003). The primary function of a preliminary injunction is to preserve the status quo. *Cigna Corp. v. Bricker*, 103 F.4th 1336, 1342 (8th Cir. 2024).

### II.    Title IX Overview

Title IX prohibits sex-based exclusion from educational programs receiving federal funds. 20 U.S.C. § 1681(a). In athletics, schools are required to "provide equal athletic opportunity for members of both sexes." 34 C.F.R. § 106.41(c). While institutions are not obligated to offer identical sports or replicate one sex's program for the other, Title IX requires that the interests and abilities of both sexes be effectively accommodated and that the program, viewed in its entirety, affords substantially equivalent participation and treatment. *Portz v. St. Cloud State Univ.*, 16 F.4th 577, 580–81 (8th Cir. 2021).

The Department of Health, Education, and Welfare's 1979 Policy Interpretation—reaffirmed in the Department's 1996 Clarification—supplies the operative structure for participation-opportunity claims. That framework evaluates whether an institution has provided equal athletic opportunity by offering three independent paths to compliance.

6

The Eighth Circuit applies this framework. *See id.*; *Chalenor v. Univ. of N.D.*, 291 F.3d

1042, 1044–45 (8th Cir. 2002).

An institution satisfies Title IX's participation-opportunity requirement if it meets

any one of the following:

(1) Substantial proportionality between male and female athletic participation and
enrollment;

(2) A history and continuing practice of program expansion responsive to the
developing interests and abilities of the underrepresented sex; or

(3) Full and effective accommodation of the interest and abilities of the
underrepresented sex.

44 Fed. Reg. at 71,418.[2]

This case concerns only the third path—commonly referred to as Prong Three.

Under Prong Three, at this stage, the question is whether:

---

[2]     The Department's athletics guidance has been updated several times since 1979
including clarifications in 1996, Department of Education, Office for Civil Rights,
*Clarification of Intercollegiate Athletics Policy Guidance: The Three-Part Test* (Jan. 16,
1996) ("1996 Interpretation"); 2005, *Department of Education, Office for Civil Rights,
Clarification of Intercollegiate Athletics Policy Guidance: The Three-Part Test-Part
Three* (Mar. 17, 2005); and 2010, *Department of Education, Office for Civil Rights, U.S.
Commission on Civil Rights, Title IX Athletics: Accommodating Interests and Abilities*
(Feb. 1, 2010). None of these revisions have displaced or altered the core three-part test.
Instead, each have reaffirmed the 1979 Interpretation as the governing framework for
assessing compliance with 34 C.F.R. § 106.41(c).
        Because the three-part test interprets the Department of Education's own
regulation—rather than the statute—its force is unchanged by *Loper Bright Enterprises v.
Raimondo*, 603 U.S. 175 (2024). *Loper Bright* eliminated *Chevron* deference for statutory
interpretation, but deference to authoritative, longstanding agency interpretations of their
own regulations remains governed by *Kisor v. Wilkie*, 588 U.S. 558 (2019). The Eight
Circuit's decisions in *Portz v. St. Cloud State University*, 16 F.4th 577 (8th Cir. 2021),
and *Chalenor v. University of North Dakota*, 291 F.3d 1042 (8th Cir. 2002), both
postdating relevant amendments, continue to apply the 1979 Interpretation and its
clarifications as controlling.

(1) There is sufficient interest and ability to sustain a team;

(2) There is a reasonable expectation of competition; and

(3) The institution acted reasonably in responding to that interest and ability.

*Id.*

The first two elements—interest and ability, and available competition—consider whether a viable athletic opportunity exists in the particular sport. If those predicates are met, the institution must take reasonable steps to accommodate that opportunity. The reasonableness inquiry is part of the merits analysis and sits within the likelihood-of-success factor under *Dataphase*.

## III.    *Dataphase* Factors

### A.    Likelihood of Success on the Merits

The Eighth Circuit has emphasized that "[s]uccess on the merits has been referred to as the most important of the four [*Dataphase*] factors." *Jet Midwest Int'l Co. v. Jet Midwest Grp., LLC*, 953 F.3d 1041, 1044 (8th Cir. 2020). That factor requires a preliminary assessment of Plaintiffs' likelihood of success under the Title IX participation-opportunity framework.

Because Plaintiffs proceed under Prong Three of the 1979 Policy Interpretation, the inquiry asks whether girls' varsity basketball is a viable opportunity this season and, if so, whether the District acted reasonably in responding to that opportunity. The detailed factual narrative relevant to this inquiry appears in the Background section and is incorporated here.

1.      *Viable Athletic Opportunity*

Under the 1979 Policy Interpretation, the viability inquiry is not itself a
reasonableness standard. It is a threshold factual determination. The question is simply
whether (1) students of the underrepresented sex have expressed interest in the sport,
(2) they have the ability or potential ability to compete at the interscholastic level, and
(3) there exists a reasonable expectation of competition within the school's normal
competitive region. 44 Fed. Reg. at 71,418; s*ee also* 1996 Interpretation. Once those
predicates are satisfied, the institution must then take reasonable steps to accommodate
the opportunity under Prong Three. The reasonableness analysis applies to the District's
*response*, not to the viability of the opportunity itself. *See* 44 Fed. Reg. at 71,415–16
(noting that the agency may deem institutions compliant if any differences in
opportunities "are the result of nondiscriminatory factors" such as "legitimately sex-
neutral factors related to special circumstances of a temporary nature").

Here, the record establishes that girls' varsity basketball is a viable opportunity
this season. S.N. has years of basketball experience and competed at the varsity level for
three years. RLCC fields a varsity girls' team within the same competitive region. These
elements are undisputed and satisfy the viability predicates of Prong Three. Because
interest, ability, and competition all exist, the analysis turns to whether the District
responded reasonably to that viable opportunity.

2.      *The District's Response to the Viable Opportunity*

As described earlier, the District and RLCC discussed cooperative structures for
the 2025–2026 season but did not reach agreement. RLCC's proposals differed based on

whether the co-op would be a fully shared 50/50 program or a hosted arrangement under RLCC's Mustangs identity.

The District declined RLCC's multi-sport 50/50 proposal and the hosted basketball-only option for reasons unrelated to sex: maintaining its volleyball and softball programs, preserving Red Lake Falls' Eagles identity, and adhering to its rebuilding plan in girls' basketball. These explanations are sex-neutral. Based on the present record, these factual assertions are not disputed.

Further, the record contains no comparator evidence. Plaintiffs identified no instance in which a male athlete from Red Lake Falls was allowed to play for another district or school outside a co-op arrangement. The longstanding boys' basketball co-op with RLCC confirms that all cross-district participation—regardless of sex—occurs only through cooperative sponsorships. The parties agree that MSHSL bylaws prohibit participation for another member school absent a co-op or a narrow exception not applicable here. Plaintiffs did not explore co-ops through Red Lake Falls with any district other than RLCC.

3.    *Timing, Administrative Constraints, and Structural Limitations*

By the time Plaintiffs retained counsel and sent their October 30, 2025 demand letter seeking permission for S.N. to play at RLCC, the administrative window for forming a co-op had already closed. MSHSL bylaws require co-op applications to be submitted at least 30 days before the first day of practice. With girls' basketball practice starting on November 10, the deadline fell around October 11. Plaintiffs' demand letter thus arrived more than two weeks after the deadline had passed and no MSHSL decision

existed that could have been appealed. Plaintiffs did not request that the District seek an

exception from MSHSL before the season began, and no timely path to relief remained

by the time the issue was raised.

These timing and structural constraints materially shape what actions were

reasonably feasible. Title IX does not require a district to accomplish what administrative

and practical circumstances make impossible.

To obtain preliminary relief, Plaintiffs must show a likelihood of proving that the

District failed to take reasonable steps to accommodate a viable opportunity. The present

record does not support that conclusion. It shows a viable opportunity, sex-neutral

explanations for declining RLCC's proposals, administrative deadlines that had passed by

the time Plaintiffs demanded action, and structural limits for the approval of co-op

proposals imposed by MSHSL rules. The record is incomplete on questions such as

whether other districts were viable options or whether alternative proposals could have

been pursued earlier in the fall. But nothing presently suggests that the District acted

outside the range of reasonable responses contemplated by Prong Three. Plaintiffs have

not carried their burden under the first *Dataphase* factor.

**B.    Irreparable Harm**

A lost senior season is irreparable. The Eighth Circuit recognizes that exclusion

from athletic competition constitutes educational harm not compensable after the fact.

*Brenden v. Indep. Sch. Dist. 742*, 477 F.2d 1292, 1299 (8th Cir. 1973). This factor weighs

strongly in Plaintiffs' favor.

11

### C.    Balance of Harms

Any injunction must be feasible. Under MSHSL rules, cooperative sponsorships are program-wide and cannot be limited to the varsity or sub-varsity competition levels. Implementing a co-op now would dissolve Red Lake Falls' junior varsity team after practices and games have already commenced and require integrating its roster—which includes one sophomore, three freshmen, two eighth graders, and a seventh grader—into a new, multi-school structure. (*See* Doc. No. 13 at 11; Schmitz Decl. ¶¶ 12, 26.) RLCC's program is also underway with its roster, schedule, coaching assignments, practice plans, and facility allocations already set. (Schmitz Decl. ¶ 27.)

Because co-ops must last at least two years, any forced co-op would extend into the 2026–27 season regardless of improving numbers or district or student preference. Plaintiffs hired counsel late in the process; their October 30 letter sought action after deadlines for co-op approvals had expired. On this record, the harm to program stability and to dozens of students beyond S.N. would exceed the benefit of interim relief. The balance of harms weighs against a preliminary injunction.

### D.    Public Interest

The public interest is served by compliance with Title IX. But it is also served by the orderly administration of interscholastic athletics, including adherence to established MSHSL deadlines, and regard for program structures that require months of planning. This Court will not restructure operating athletic programs midseason or impose multi-year co-ops between districts without a fully developed record and a clear showing of entitlement. Here, the structural constraints on feasibility, the absence of evidence of sex-

based decision-making, and the late posture of the request weigh against granting interim relief.

**CONCLUSION**

The record reflects a viable girls' varsity basketball opportunity in the region, a student with the interest and ability to compete, and a dispute between districts over the structure of a cooperative sponsorship. It also reflects sex-neutral reasons for the District's decisions, a lack of male comparators, and the practical impossibility of implementing the requested remedy midseason.

Plaintiffs have not demonstrated a likelihood of success under the Title IX participation-opportunity framework, and the other *Dataphase* factors do not overcome that deficiency. For these reasons, the motion for preliminary injunction is denied.[3]

**ORDER**

Based on the foregoing, and all the files, records, and proceedings in this case,

**IT IS HEREBY ORDERED** that Plaintiffs' Motion for Preliminary Injunction (Doc. No. 4) is **DENIED** without prejudice.

Date: November 26, 2025

                                                                *s/ Jerry W. Blackwell*
                                                                JERRY W. BLACKWELL
                                                                United States District Judge

---

[3]     Plaintiffs also plead claims under Minnesota law and the Minnesota Constitution. (*See* Doc. No. 1; Doc. No. 6 at 3.) Neither the briefing nor the oral argument proposed a distinct theory under those provisions that alters the preliminary-injunction analysis, which turns on the federal Title IX standard. This Court therefore limits its analysis at this stage to the federal claim on which Plaintiffs' request for interim relief is premised, without prejudice to full consideration of the state-law theories at later stages of the case.